UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CAROL M.,[1]

                              Plaintiff,                  DECISION AND ORDER

-vs-

                                                     1:19-CV-1593 (CJS)

COMMISSIONER OF SOCIAL SECURITY,

                             Defendant.

_____

INTRODUCTION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Disability Insurance Benefits ("DIB"). Both parties have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Pl.'s Mot., Apr. 20, 2020, ECF No. 7; Def.'s Mot., June 30, 2020, ECF No. 11. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings [ECF No. 7] is denied, the Commissioner's motion [ECF No. 11] is granted, and the Clerk of Court is directed to close this case.

LEGAL STANDARDS

The law defines "disability" as the "inability to engage in any substantial

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

1

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to qualify for DIB benefits, the DIB claimant must satisfy the requirements for a special insured status. 42 U.S.C. § 423(c)(1). In addition, the Social Security Administration has outlined a "five-step, sequential evaluation process" to determine whether a DIB claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. § 404.1520(a)(4)(i)–(v).

When a claimant alleges a mental impairment, the Commissioner's regulations require the ALJ to apply a "special technique" at the second and third steps of the five-step evaluation process. *Petrie v. Astrue*, 412 F. App'x 401, 408 (2d Cir. 2011) (citing 20 C.F.R. § 404.1520a). First, the ALJ must utilize the "Paragraph A" criteria[2]

---

[2] The listings of specific mental impairments in 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00 ("App'x 1 § 12.00") provide the ALJ with additional guidance for application of the "special technique." Generally, a claimant must satisfy at least two classes of criteria to justify a finding of a mental disorder. "Paragraph A" criteria include the "the medical criteria that must be present in [a claimaint's] medical evidence" to indicate a particular disorder (e.g., the mental disorder of

2

to evaluate the claimant's pertinent symptoms, signs, and laboratory findings and determine whether he or she meets the requirements of one of the mental impairments listed in 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00 ("App'x 1, § 12.00"). *See* 20 C.F.R. § 404.1520a(b)(1). If the claimant does have such an impairment, the ALJ must assess the claimant's limitations in the four broad areas of mental functioning that constitute the "Paragraph B" criteria. 20 C.F.R. § 404.1520a(c)(3). Alternatively, several of the listings in App'x 1, § 12.00 include "Paragraph C criteria," as well, and a claimant will meet the listing if he satisfies the Paragraph A criteria *and* the criteria outlined in either Paragraph B or Paragraph C.

## BACKGROUND

The Court assumes the reader's familiarity with the underlying facts and procedural history in this case. However, the Court provides a brief recitation of the relevant facts as they pertain to Plaintiff's arguments before this Court.

Plaintiff filed her application for DIB benefits on October 21, 2015, alleging that she became unable to work because of her disabling condition on April 1, 2009. Transcript ("Tr."), 188, Feb. 19, 2020, ECF No. 6. In her disability report, Plaintiff reported four conditions as limiting her ability to work: autism spectrum disorder

---

"schizophrenia" requires that the evidence include medical documentation of hallucinations or another similar symptom). App'x 1 § 12.00A(2)(a). "Paragraph B" criteria are the four functional areas of (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. App'x 1 § 12.00A(2)(b). "Paragraph C" criteria are used to evaluate "serious and persistent mental disorders." To satisfy the paragraph C criteria, the claimant must show, among other things, "a medically documented history of the existence of the disorder over a period of at least 2 years . . . ."

level 1, depression, hoarding, and "behavioral." Tr. 220. On November 23, 2015, the Commissioner determined that Plaintiff did not qualify for DIB benefits. Tr. 90. Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 96.

Plaintiff's request was approved and the hearing was held before an ALJ on September 10, 2018 in Buffalo, New York. Tr. 30. Plaintiff appeared with her attorney, and an impartial vocational expert (the "VE") was also present. Tr. 32. At the hearing, Plaintiff testified that although she has not worked since 2009, she lives alone, has three college degrees, drives seven days a week, spends multiple hours each day visiting her mother at the nursing home, runs errands at Walmart, goes to the gym twice a week, goes to church on Sunday mornings, participates in her church's singles group, volunteers in a local ministry for the deaf, and manages both her own and her mother's finances. Tr. 37–44. Further, she testified she has no difficulty walking, standing, bending, kneeling, sitting, lifting and carrying, pushing and pulling, or climbing stairs, and only a mild limitation in reaching. Tr. 44–46.

Following this testimony, the ALJ asked: "Tell me . . . why you think you can't work." Tr. 46. Plaintiff responded as follows:

> Well, number one, is . . . the anxiety part . . . I always had problems . . . where I'd be okay for a while, but, if something would happen where I'd be challenged, or something wasn't all right, they wouldn't listen to me, I get frustrated, and that would set me off. And the whole day would be shot.
>
> \* \* \* \*

> . . . I thought it was a hormonal thing until a friend of mine says . . . I was more socially . . . awkward . . . I never had friends in high school, and I always was a loner.
>
> My mother would even joke with me as a child that the neighborhood kids . . . I'd always be two steps behind them . . . . I was socially awkward . . . . I didn't . . . quite fit in. I was always on the outside looking in.

Tr. 46–47.

Following the ALJ's examination, Plaintiff's attorney was permitted to question Plaintiff:

> [Attorney:] Would you have social problems . . . getting along with coworkers, or supervisors, or maybe . . . the general public at work?
>
> [Plaintiff:] Supervisors not so much, but the coworkers . . . I never really was buddy, buddy with them . . . . I just kept to myself and did my thing . . . . I don't like dealing with people.

Tr. 54–55. Plaintiff also testified that she didn't have trouble concentrating or following directions, that she "pretty much remember[s] most things," and that she is "pretty happy usually, pretty even-keel . . . ." Tr. 56–57. However, Plaintiff admitted that when "something goes wrong" she gets stressed and frustrated and needs to be left alone, and that she needs time to think about her decisions and doesn't want to be pressured into anything. Tr. 56–57.

Lastly, the ALJ examined the VE about Plaintiff's work history. The VE testified that Plaintiff had reported that in the fifteen years prior to her last job in December 2009, she had served as an inventory control clerk, document control analyst, and data entry operator. Tr. 67. The ALJ then presented the VE with a hypothetical:

5

> [ALJ:] [P]lease assume someone with claimant's age; she is currently 59. Her education is Bachelor of Science in computer information systems. She also has Associates Degrees in data processing, and material science technology.
>
> For my first hypothetical, routine work, occasional interaction with others, and no public interaction. Could any of the past relevant work be done?
>
> [VE:] No, Your Honor . . . .
>
> [ALJ:] Okay. So is there other work that can be done . . . ?
>
> [VE:] At the medium level, yes, Your Honor . . . . The first position would be that of a meat clerk . . . . The second position would be that of a kitchen helper . . . And then our final position would be that of a cleaner industrial.

Tr. 68–69.

In her decision denying Plaintiff's application for DIB benefits, the ALJ found that Plaintiff met the special insured status requirements of the Social Security Act through December 31, 2009. Tr. 17. Therefore, Plaintiff was required to demonstrate that she was disabled between her alleged onset date of April 1, 2009 and December 31, 2009 ("date of last insured"). At step one of the five-step evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity between April 1, 2009 and December 31, 2009. Tr. 17. At step two, the ALJ determined that Plaintiff had two severe mental impairments: autism spectrum level 1 disorder, and anxiety disorder. Tr. 17.

At step three of the process, the ALJ applied the "special technique" and determined that Plaintiff's mental impairments, considered either individually or in

combination, did not meet or medically equal the criteria of Mental Disorder listings 12.06 (anxiety and obsessive-compulsive disorders), or 12.10 (autism spectrum disorder) in 20 C.F.R. Part 404, Subpart P, App'x 1. Tr. 18. The ALJ found that Plaintiff did not meet the Paragraph B criteria because she had only mild limitations with respect to her ability to understand, remember, and apply information; moderate limitations with respect to her ability interact with others, and concentrate, persist, or maintain pace; and no limitation with respect to Plaintiff's ability to adapt or manage herself. Tr. 18. The ALJ also found that Plaintiff did not satisfy the Paragraph C criteria. Tr. 19.

Before proceeding to step four, the ALJ made a determination of Plaintiff's residual functional capacity. "Residual functional capacity" ("RFC") means the most that the claimant can still do in a work setting despite the limitations caused by the claimant's impairments. 20 C.F.R. § 404.1545. After careful consideration of the entire record, the ALJ determined that through the date of last insured – i.e., December 31, 2009 – Plaintiff had the RFC to perform a full range of work at all exertional levels, with the following non-exertional limitations: routine work, occasional interaction with others and no public interaction. Tr. 19.

Given Plaintiff's non-exertional limitations, the ALJ found that she was unable to perform her past relevant work as an inventory control clerk, document control analyst, or data entry operator. Tr. 23. However, based on Plaintiff's RFC, age, education, and work experience, and the testimony of the VE, the ALJ found that

Plaintiff was capable of making a successful adjustment to such other positions in the national economy as meat clerk, kitchen helper, or cleaner, industrial. Tr. 24. Hence, the ALJ found Plaintiff *was not* disabled for the purposes of DIB. Tr. 24.

On October 2, 2019, the Social Security Administration's Appeals Council denied Plaintiff's request for further review of the ALJ's decision. Tr. 1. The ALJ's decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

DISCUSSION

42 U.S.C. § 405(g) defines the process and scope of judicial review of the final decision of the Commissioner on whether a claimant has a "disability" that would entitle him or her to DIB benefits. A reviewing court must first determine "whether the Commissioner applied the correct legal standard." *Jackson v. Barnhart*, No. 06-CV-0213, 2008 WL 1848624, at *6 (W.D.N.Y. Apr. 23, 2008) (quoting *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Failure to apply the correct legal standards is grounds for reversal." *Id.* (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). However, provided the correct legal standards are applied, a court's review of the Commissioner's decision is deferential: a finding by the Commissioner is "conclusive" if it is supported by "substantial evidence." 42 U.S.C. § 405(g). In other words, "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the Court] will not substitute our judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

In seeking reversal of the Commissioner's decision, Plaintiff has raised two primary issues. Pl. Mem. of Law, Apr. 20, 2020, ECF No. 7-1. First, Plaintiff argues that the "ALJ failed in his duty to develop the record because he did not attempt to obtain any opinion evidence retroactive to the relevant time period." Pl. Mem of Law at 7. Second, Plaintiff argues that the ALJ did not properly weigh the opinion evidence. The Court finds no merit in either of Plaintiff's arguments.

<u>The ALJ's Duty to Develop the Record</u>

In arguing that the ALJ failed in his duty to develop the record, Plaintiff observes that "[d]espite evidence that Plaintiff's condition existed since her childhood, the ALJ did not attempt to obtain any opinion evidence that would be retroactive to the time period." Pl. Mem. of Law at 8. This failure, Plaintiff states, "is reversible error requiring remand." Pl. Mem. of Law at 9. The Court disagrees.

It is well-settled that ALJs have an affirmative duty to develop the record. *See Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). Indeed, 20 C.F.R. § 404.1512(b)(1) provides, in pertinent part, that the Commissioner "will develop [a claimant's] complete medical history for at least the 12 months preceding the month in which [a claimant files his or her] application unless there is a reason to believe that development of an earlier period is necessary . . . ." Hence, "[w]hen there is an obvious or 'clear gap[ ]' in the record, the ALJ is required to seek out missing medical records, even when a party is represented by counsel." *Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642, 644 (2d Cir. 2020) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.

9

1999)). Nevertheless, the duty to develop the record has limits: "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information . . . ." *Rosa*, 168 F.3d at 79 n.5.

In the present case, the record clearly shows that the ALJ discharged her duty to develop the facts and arguments to ensure a proper disposition of the case. For instance, at the outset of the hearing on September 10, 2018,[3] the following exchange occurred between the ALJ and Plaintiff's attorney:

> [ALJ:] I see there was a document submitted late.
>
> [Attorney:] Yes, that was the claimant's most recent treatment visit with Dr. Morelli, which was in the letter that we did submit to your office on August 13.
>
> * * * *
>
> [ALJ:] Oh, okay. In that case, because it was this past Friday, I will accept it . . . .
>
> * * * *
>
> [Attorney:] And the only other record we were waiting on . . . [is] Kimberly Le[i]ker, the claimant's current counselor. Unfortunately, despite making three requests of her, she has not gotten back to us. . . .
>
> * * * *
>
> [ALJ:] Would you like me to send a subpoena?

---

[3] In addition to the September 2018 hearing, an initial hearing was held on May 4, 2018. At that hearing, the ALJ indicated that Plaintiff's counsel was late submitting a letter request to hold the record open for additional medical evidence. Tr. 76–77. After discussion, the ALJ agreed with counsel that it was in Plaintiff's best interest not to waive her 75-day notice period so that the record could be held open for the receipt of additional documentation from Plaintiff's doctors. Tr. 77–82.

10

[Attorney:] Yes, actually, that would be very helpful . . . .

Tr. 33–35. The record indicates that the ALJ successfully obtained the additional evidence from LMHC Leiker, and considered it in rendering her decision. Tr. 301.

Perhaps more to the point, despite Plaintiff's testimony about her childhood and LMHC Leaker's suggestion in her 2017 letter that Plaintiff's autism must have affected her since childhood, there was no reason for the ALJ to believe there was a gap in the record. The record contained medical records from Plaintiff's annual check-ups with her primary care physician Dr. Morelli, whose neurological and psychological evaluations of Plaintiff dating back to 2009 indicated her status was "normal," and did not indicate any psychological issues until his 2010 exam. *See, e.g.,* Tr. 381. In addition, Plaintiff's gynecologist, Dr. Hage, also assessed Plaintiff's neurological systems as "normal" beginning in 2007. Tr. 407–456. Indeed, it was not until her 2014 evaluation by Dr. Englert, a neuropsychologist, that Plaintiff was specifically diagnosed as being on the autism spectrum. *See, e.g.,* Tr. 406 (noting, in an OB/GYN record in 2015, that Plaintiff was "recently diagnosed with autism (Asperger)").

The Court declines to find that an ALJ failed in her duty to develop the record where she patiently awaited additional documents from Plaintiff's counsel, actively sought additional records at Plaintiff's counsel's request, and possessed no information pointing to a specific treatment provider relevant to the ALJ's inquiry whose records had not already been obtained.

11

The Weight of the Opinion Evidence

Plaintiff also maintains that the ALJ did not properly weigh the opinion evidence pursuant to the factors identified in 20 C.F.R. § 404.1527(c). Pl. Mem. of Law at 9. Specifically, Plaintiff argues: (1) that the ALJ erred in giving any weight to the "single decision maker" ("SDM")[4] who initially denied Plaintiff's claim; (2) that the ALJ's analysis of Dr. Englert's opinion was incomplete and not properly related to the RFC finding; and (3) that the inconsistency between the ALJ's giving great weight to Dr. Englert's opinion and limited weight to LMHC Leiker's opinion "smacks of cherry-picking the evidence." Pl. Mem. of Law at 10–13. The Court does not find error justifying remand in any of the issues that Plaintiff raises.

### *R. Bostaph's Opinion*

Plaintiff notes that the ALJ gave "little weight" to the opinion of R. Bostaph, the SDM who classified Plaintiff's mental impairments as "non-severe," and made the initial determination denying Plaintiff's DIB benefits. Pl. Mem. of Law at 10; Tr. 88. Citing to a 2015 decision in this district, Plaintiff states that giving any weight to the SDM's opinion was reversible error. Pl. Mem. of Law at 10 (citing *Gray v. Colvin*, No. 1:13-CV-00955 MAT, 2015 WL 5005755, *5 (W.D.N.Y. Aug. 20, 2015)).

While it is true that numerous courts in this Circuit have concluded that assigning evidentiary weight to an SDM's opinion is error, the error in this case is

---

[4] "SDMs are non-physician disability examiners who 'may make the initial disability determination in most cases without requiring the signature of a medical consultant.'" *Hart v. Astrue*, 32 F. Supp.3d 227, 237 (N.D.N.Y. 2012).

12

harmless. *See, e.g., Hart v. Astrue*, 32 F. Supp.3d 227, 237 (N.D.N.Y. 2012). Here, the ALJ assigned "limited weight" to the SDM's decision, noting that the SDM had no opportunity to examine Plaintiff, and finding that the medical evidence furnished after the SDM rendered his decision "clearly" shows that "the claimant's impairments have more than a minimal impact on her ability to do work." Tr. 22. As such, this Court has no difficulty in concluding that the ALJ would have reached the same conclusion even if she had assigned no evidentiary weight to the SDM's assessment. *Compare Hart*, 32 F. Supp.3d at 237 (finding harmless error where the ALJ assigned the opinion minimal weight and made a more restrictive RFC determination), *with Barrett v. Berryhill*, 286 F. Supp.3d 402, 429–30 (E.D.N.Y. 2018) (finding reversible error where the ALJ's RFC determination is "closely aligned" with the SDM's opinion).

### *Dr. Englert's Opinion*

20 C.F.R. § 404.1527(c)(1)–(6) requires that the ALJ consider the following factors in weighing medical opinions: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, (6) other factors, such as the expert's level of understanding of the Commissioner's disability programs. With respect to the ALJ's treatment of Dr. Englert's opinion, Plaintiff states that although the ALJ considered the factor of "specialty" pursuant to § 404.1527(c)(5), the ALJ's analysis "failed to meaningfully consider *any* of the other factors as it was entirely conclusory." Pl. Mem. of Law at 10 (emphasis in original). Plaintiff also states

that "though the ALJ summarized [Dr. Englert's] findings in her decision . . . she gave absolutely no explanation of how these limitations informed the RFC . . . ." Pla. Mem. of Law at 11. The Court disagrees with Plaintiff, and finds that the ALJ's treatment of Dr. Englert's opinion was adequate.

In her decision, the ALJ expressly stated that she "considered the opinion evidence in accordance with the requirements of" § 404.1527. The ALJ then began her discussion of the medical evidence generally by stating that "the medical records provide little support in the way of disabling symptoms prior to the date last insured . . . ." Tr. 20. Turning to the evidence recorded by Dr. Englert, the ALJ used Dr. Englert's report almost verbatim. She wrote:

> [Claimant] reportedly performed well throughout her academic career and performed well within the quality of her vocational work. However, she did struggle with social interactions at work . . . . [C]laimant demonstrates a generally normal level of cognitive functioning but does require some level of support for social and occupational functioning . . . . The claimant demonstrated intact cognitive functioning across most domains assessed. She demonstrated a relatively slowed speed of information processing, which fell within the borderline range. She also demonstrated a perseverative nature to her thinking, which impaired her ability to quickly make decisions on timed tasks. Otherwise, attention language, visual spatial reasoning and complex problem solving and cognitive flexibility were within normal limits . . . .

*Compare* Tr. 20–21, *with* Tr. 399 (esp. ¶ 1 and 2).[5] The ALJ noted that Dr. Englert's decision was entitled to "great weight" because it was based on "comprehensive

---

[5] This assessment is consistent with Plaintiff's own testimony as to her work history (Tr. 38–40, 46, 53–57), and with the statement of Plaintiff's first mental health therapist, Dr. Hildreth, that Plaintiff manifests "[p]ersistent deficits in social communication and social interaction across contexts, not accounted for by general developmental delays." Tr. 312 (also noting that plaintiff experiences "[r]estricted, repetitive patterns of behavior, interests, or activities . . .").

testing" (Tr. 22) that occurred during three examinations (Tr. 20) in an area of her "specialty" (Tr. 22).

In short, the ALJ's decision shows that she adequately considered all of the § 404.1527(c) factors with respect to Dr. Englert's medical opinion. The ALJ considered the examining and treatment relationship when she noted Dr. Englert saw Plaintiff for three examinations. Tr. 20. She considered the supportability and specialty when she noted that the opinion was based on "comprehensive testing" in Dr. Englert's area of specialty. Tr. 22. Lastly, that the ALJ considered the consistency of Dr. Englert's opinion with the rest of the record, as well as other factors, is evident in her comments – at several points in her decision – that the evidence shows Plaintiff's functional impairments do not preclude all work. Tr. 22. The Court finds no error in the ALJ's analysis.

*LMHC Leiker's Opinion*

Finally, Plaintiff takes issue with the ALJ's assessment giving "limited weight to the . . . opinion of LMHC Leiker as it does not cover the period up to 2009, the date last insured." Tr. 22. Plaintiff states that the ALJ's reasoning with respect to the opinion of LMHC Leiker, who served as Plaintiff's mental health counselor in 2016–2017, is inconsistent with the ALJ's assessment of Dr. Englert's opinion, which was rendered based on an evaluation from 2014. Pl. Mem. of Law at 13. Plaintiff points out that notwithstanding the fact that both individuals assessed Plaintiff well after her date last insured (December 2009), Dr. Englert's opinion was given great weight

15

while LMHC Leiker's opinion was given only limited weight. Plaintiff believes this to be improper "selective cherry-picking of the record." Pl. Mem. of Law at 13 (quoting *Proper v. Comm'r of Soc. Sec.*, No. 1:12-CV-0098 MAT, 2014 WL 7271650, at *14 (W.D.N.Y. Dec. 18, 2014)). The Court disagrees.

In 2014, Dr. Englert produced a seven-page report containing an extensive subjective patient history, objective test results, and detailed conclusions and opinions. Tr. 394–400. Although the extensive battery of tests on Plaintiff unquestionably yielded only a snapshot of Plaintiff's functionality as of the time of testing, Dr. Englert sought to put the diagnostic snapshot into context by relating it to Plaintiff's history:

> [Plaintiff] has a longstanding history of behavioral and functional difficulties . . . . She reportedly performed well throughout her academic career and performed well with the quality of her vocational work . . . . [But p]ersistent deficits in social communication and social interaction are noticed throughout her schooling and work situations.
>
> * * * *
>
> [Nevertheless, Plaintiff] is otherwise demonstrating intact cognitive functioning across most domains assessed.

Tr. 399.

By contrast, LMHC Leiker's opinion is a two-page letter to the Court consisting entirely of general narrative focused primarily on present treatment needs. Tr. 469–470. LMHC Leiker notes that Plaintiff began counseling sessions with her in 2016 "as a way to continue addressing *current* issues and work toward meeting her treatment goals." Tr. 469 (emphasis added). Although LMHC Leiker did state that "a

16

lifetime of going undiagnosed with Asperger's . . . . affected [Plaintiff]'s ability to effectively interact and communicate with people," the letter's focus is on "current symptoms." Tr. 469 For instance, LMHC Leiker makes much of the link between Plaintiff's "current symptoms" and "her mom's standard of care and overall quality of life while residing at the nursing home," where she moved approximately three years following Plaintiff's date of last insured. Tr. 469. LMHC Leiker then opines that Plaintiff's present symptoms include hoarding, which is a manner of coping with the stress from her mother's situation. Tr. 470. Therefore, she recommends that Plaintiff "seek mental health counseling on a regular weekly basis . . . to address her *presenting* symptoms . . . ." Tr. 470. Whereas Dr. Englert's opinion is diagnostic and involved a thorough patient history, LMHC Leiker's opinion is focused on treatment of Plaintiff's symptoms in the present and future.

For the foregoing reasons, the Court finds that the respective weights the ALJ assigned to the opinions in the record do not constitute reversible error.

## CONCLUSION

Accordingly, it is hereby ORDERED that Plaintiff's motion for judgment on the pleadings (ECF No. 7) is denied, and the Commissioner's motion (ECF No. 11) is granted. The Clerk of Court is directed to close this case.

DATED:   February 26, 2021
         Rochester, New York

                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge